UNITED STATES v. KALLSTROM and others.

*(District Court, W. D. Michigan, N. D.　1887.)*

INTERNAL REVENUE—WHOLESALE LIQUOR DEALERS LICENSE.

    Where retail liquor dealers organize themselves under the style of a "Protection Union," and sign "articles" pledging themselves to purchase beer through the "Union" of brewers in another state, by which means they save two dollars a barrel, and, no wholesale licenses having been taken out as provided by Rev. St. U. S. § 3242, such purchases are made through the secretary and treasurer of the "Union," who is paid nothing for his services, the members being charged only with freight, storage, and the like. the retail dealers become wholesale dealers, and are liable to the penalty set out in that section.

Indictment under Rev. St. U. S. § 3242, for carrying on the business of wholesale liquor dealers without licenses.

The following letter from the district to the circuit judge states the case:

GRAND RAPIDS, MICH., October 13, 1886.

*Hon. Howell E. Jackson*—MY DEAR JUDGE: At my last term, at Marquette, a case was tried before me involving a question upon which I was in great doubt. The case was this: Certain retail liquor dealers, who were saloon keepers at Garden City, in the upper peninsula, and who had obtained licenses as such, had been supplied with beer by a wholesale dealer whose place of business was also there. Finding that they could supply themselves at two dollars less per barrel than the local dealer was selling at, these retail dealers organized themselves into an association which they called the "Protection Union," composed of themselves and some dealers of their class from neighboring towns, the several parties signing what they termed "articles," but which, in fact, were nothing more than a pledge that they would severally purchase their beer, through the Union, of a certain house of brewers in Milwaukee. They appointed a secretary and treasurer. They had a place of deposit, where, when an invoice of beer arrived by rail from Milwaukee, the beer was stored in barrels. When any of the members wanted beer, he would send a drayman, with an order to the secretary and treasurer, who was the same person. It would be delivered to the drayman for him, and a memorandum of it made, and, on the treasurer's demand, it was paid for by the member (at the actual cost) by the barrel. As fast as the stock began to get low, each member would make his estimate of about what he would want of the next order, and the secretary and treasurer would make out an order in the name of the Union for the amount (about) of the aggregate of the orders, and send it into the Milwaukee concern, which would thereupon ship the beer, by car-load, to the "Protective Union," against which the bills were made out. These bills were paid by the secretary and treasurer, who collected from each the payment for so much as he actually had, and no more. Thus there would be some time between the shipment of the beer and the payment therefor to the Milwaukee people. As between themselves, each member of the Union was liable only for what he had, though probably, as between them and the Milwaukee house, each would be liable, *in solido,* for the whole of the stuff sent. The Union made no profit. The secretary and treasurer, who was one of their number, charged nothing for his services; and charges for which the members paid, freight, storage, and the like, were to cover actual cash only. The wholesale dealer on the ground was, of course, crowded out. The Union paid no liquor tax.

Five of the members of the Union were prosecuted by the United States for being in the business of wholesale liquor dealers without license. At the trial it was urged, on the part of the government, that these facts amounted to a sale by the Milwaukee firm to the Union, and a resale by it to its members, and that the question of profit was not material; and on the part of the defendants that, in substance, it was a mere device of the retail dealers to get their stuff cheaper by association, and that the Union was not a "dealer," which term contemplated a being in the business for the purpose of buying and selling for profit.

On the authority of two cases in the federal courts, to which you are referred,—*U. S.* v. *Roligeo,* 28 Int. Rev. Rec. 314, (S. D. Ill., TREAT, J.;) *U. S.* v. *Wittig,* 22 Int. Rev. Rec. 98, (D. Mass., LOWELL, J.,)—and notwithstanding *Com.* v. *Smith,* 102 Mass. 144, and the cases therein referred to, which were cited by counsel for the defendants; and in view of the results to the federal revenue by the crowding out of the middle-men, who are wholesale dealers, by such a practice; and upon consideration that the Union might be regarded as, in fact, dealing for profit, the profit being the two dollars saved by the members on each barrel,—yet, with considerable misgiving, I instructed the jury that, these facts being admitted by the defendants, they should find the defendants guilty. I imposed sentence, fine to be paid in 60 days, and, in default, imprisonment, etc. The 60 days were given to give time for further consideration and consultation. The question is so close, and the practice in question one which, if allowed, may become so wide-spread, that I conclude to trouble you for your views upon it.

Very respectfully yours,                                            H. F. SEVERENS.

*G. Chase Godwin,* U. S. Dist. Atty., for the United States.
*Hurley & Mapes,* for defendants.

JACKSON, J. I have considered the foregoing case, and the authorities referred to, and am of the opinion that the ruling of the district judge at the trial was correct. The construction of the revenue laws should not be so loose as to permit evasions on merely fanciful and unsubstantial distinctions. If "profit" is necessarily a part of the business which constitutes the Union in this case a dealer, it is found in the amount saved to the members on each barrel purchased. It is not material that the profit does not come to the Union, but is directly realized by the members.